Warren Nelson v. Administrator of the Estate of Mark Campbell, deceased, Appellant, by Michael Warner v. Heartland of Galesburg IL, and Paul Orland, Appellate, by Anton Marquis My name is Michael Warner and I represent the Plaintiff of William Nelson, Administrator of the Estate of Margaret Campbell, deceased, against Heartland of Galesburg IL, LLC, DBA, Heartland Health Care Center-Galesburg, and Paul Orland This case started out as a personal injury action against a nursing home and ended up in a contract dispute. Margaret Campbell, after many years of marriage, had a stroke in the summer of 2015, and in August of 2015 was admitted into the defendant's nursing home in Galesburg. The day she signed an establishment agreement authorizing her to be a resident there, to be treated there, and the day after her admission into the hospital, her husband signed and purported a voluntary arbitration agreement. Mrs. Campbell passed away in April 2016. We filed an action after she passed, based upon the survival act, alleging that she sustained serious injuries to her person as a result of that, and passed. We did not file a wrongful death account. We also filed a count sounding the $100,000 family expense act. You did file a wrongful death? I'm sorry, I didn't catch that first. You did not file? Or you did file? No wrongful death action. No wrongful death action, correct? Just a survival action and one at a nursing home. Well, pursuant to the nursing home act, the defense filed a motion to dismiss and compel arbitration. They also filed a motion to dismiss Paul Orman from the litigation on the basis that he was not an owner, not the owner, but an owner of the nursing home at the time of the defendant's election complaint. The motions were brief. They were heard by the trial court, and the trial court granted the motion to dismiss and compel arbitration, and also dismissed Paul Orman. The court's decision was that he was not a proper party defendant. This appeal resulted in this. Primarily, the defendant, it is their burden to prove that these motions to dismiss him, suggest that the primary reason for their motion to dismiss is they believe that the husband had either implied or apparent authority to act on behalf of his wife in terms of the freestanding arbitration agreement. The arbitration agreement was not embodied in the establishment agreement, and the signing of that document was not a condition for admission into the nursing home, which some arbitration cases are. Your client, or, well, the decedent, was incapacitated, correct? I'm sorry, Your Honor? The decedent was incapacitated? Yes. Okay. Yes. Okay. What authority, and from whom did it flow, was the establishment, what is that, admission agreement? It's a fancy term for that, right? To be admitted. Yes. And who was that that signed that? He signed that. In what capacity? I'm, for her. Yeah, well. Okay. To create an agency of agreement. Additional facts are that there's no presumption that one spouse has authority to act on behalf of the other in this context. The Perto case, authored by Judge Whitman, was heard in court a few years ago. No guardianship order authorizing the plaintiff to admit his or her wife's affairs. No living will, no trust appointing the plaintiff to admit legal affairs. Additionally, in the arbitration agreement itself, it identifies the parties as the patient, Mrs. Gamble, and Mrs. Gamble's legal representative, and it identifies the word heartland in one place and center in another. Nowhere in this arbitration agreement is the language of the real identity of the nursing home defendant stated. Nowhere is an additional ground, we suggest, for the ruling that the judge was incorrect in dismissing this case. That arbitration agreement was invalid on its face because it doesn't identify who the nursing home realtor is. Primarily, the defendants want to allege that there was implied authority. We're not alleging that there was expressed authority, but implied authority is conduct of the principal and the agent. There are no significant facts to support that. None. Well, okay, so this spouse has had a stroke, and she's not getting into a care facility unless somebody signs something. Do you think she would expect her husband to leave her out in the driveway or the backyard? The decision to be placed in a nursing home is a health-related decision. The arbitration agreement in the cases that we cite is not a health-care decision, unless pursuant to the outline. Let me, I get your point. So you then would agree that he had the authority to sign the, we'll call it, mission establishment, exactly what he signed on day one to admit her to the home. You agree he had the authority to do that? Yes, sir. Under what? The surrogate act. And the surrogate act says? A relative, and there's a list, I don't think, it starts off with the spouse that he can make the health-care decisions. So your argument is this was separate, standing alone, arbitration agreement, not incorporated into the agreement to provide health care? Yes. And that properly, husband acted as an agent for his incapacitated spouse to, under that act, to receive health care. Yes. But now this agreement over here concerns legal rights. Yes. And there is no principal agency relationship in actual fact, nor can the one be construed to be implied or apparent. Or apparent. Yes. There's one additional element to that. If you look at the arbitration agreement, the agreement says, the arbitration agreement. Fourteen, health-care decisions. The parties hereby stipulate that the decision to have the patient move into the center and the decision to agree to this agreement are each a health-care decision. When you say this agreement, we're talking the arbitration agreement. Well, that's one way to interpret it. The other way to interpret it is that it refers to the sentence above it. But regardless. What's the sentence above it? The sentence above it says, the parties hereby stipulate that the decision to have a patient move into this care center. That would be moving into, that would be the health-care provision agreement. In the health-care facility. Well, the agreement for the facility to provide health care. Yes. Which I would like to call a health-care provision agreement. You say you've got an arbitration agreement. And then you've got an agreement to be placed in a facility. Okay. That's for health care. Yes. Right. One of the cases says ultra-virus. The decision to enter into an arbitration agreement is ultra-virus of the agreement to enter into the health-care facility. Unless, unless the signing of the arbitration agreement is a condition for the admission into the nursing home. Well, let's break this down if we can make it even more straightforward. And that is, I think you're saying this, the arbitration agreement basically says it's voluntary. And the signing of this has no effect or is not a requirement for you to be admitted to and treated at our facility. Is that fair? Well. He wasn't required to sign this as a condition for his wife to be treated there. Is that correct or wrong? It's absolutely correct. Okay. So here's my question. What is, and this was signed on day two. Signs are in on day one. She's admitted. Day two, somebody comes to them and says, hey, why don't you look at this and sign this. So my question is, what's the consideration for a contract? What do we got to have? One of the necessary elements is consideration. What's the consideration for this agreement? No. Not at all. And I argue that the person is giving up their rights to pursue their injury case in the civil justice system with a jury trial and all that encompasses. The defendant says, well, wait a second. The consideration is the mutual benefits that each party receives. I'd like to hear what benefit legally that is to this lady who is in the nursing home and giving up her. Do you even have to get there if, indeed, the resident in the nursing home, the principal, never signed it, did not have the capacity to sign it, and there was no one who was authorized to act on her stead? Don't have to get there. Okay. Don't have to get there. Counsel has two minutes. The Paul Orman situation. The owner can be sued. The owner of the nursing home can be sued in addition to the licensee. Why sue them when we have the correct name of the nursing home as the licensee? Because the statute authorizes it. And the ownership is not really a common law definition. It's a somewhat tortured analysis or description of what an owner is of a nursing home in the Nursing Home Care Act. That's what I tried to bring out to the court. It just said, summarily, he's not a proper party. Where did I get this? On the website for the Nursing Home Act, it has him listed as an 8% owner. So all I was asking for was an affidavit. My client presented an affidavit, and we agreed with that position. Not so from Mr. Orman. So we're asking for the reversal along those lines as well. And the surrogate act, they say that the surrogate act somehow authorizes Mr. Campbell to sign this arbitration agreement. It has something to do with that legal decision. Well, first of all, I mean, it seems like if the judge is saying this case goes to arbitration, then that's a decision for the arbitrator whether or not this person is a proper defendant or not. Isn't it? I mean, you can't have it both ways, it seems like. Once it goes to arbitration, then the arbitrator decides those things. And once the judge decides, hey, this case belongs to arbitration, he's done. And he or she or the trial judge is done. Then it goes to arbitration, and that stuff can be argued out. I haven't thought that through, but he dismissed Orman from the case. He didn't say, well, this is referred and, you know, let the three arbitrators decide. I also want to argue, and I just have 30 seconds, the disagreement. We're not alleging fraud, the rest of that, but this is an unpunishable hamper. If you read this, it really envisions a situation where it would be never ending. All an arbitrator would have to do was to find against the other two arbitrators. And then it would go back through the process and up through another hearing. I mean, this is ‑‑ I remember this thing way long ago. I remember Jarvis versus Jarvis. I mean, it's going on and on. I can't remember which book it was. Dickens. Bleak House. Bleak House? Yes. Famous case. So for a number of grounds of justices, we ask that the decision be reversed. And we go back to Palesburg and get this case started. Thank you. All right. Thank you, Mr. Warner. Good morning. Can I pronounce Mr. Wright as Mr. Marquis? Marquis. Marquis. Okay. My bad. Sorry. Fire when ready. Good afternoon. May it please the court, counsel. My name is Anton Marquis. I represent Hartland and Mr. Paul Hormann. I think from the outset we have to remember that there's two separate motions here. There's the arbitration motion that requests Hartland. And then there's the motion to dismiss Mr. Hormann simply because he's not in the facility and doesn't fall under the arbitration agreement. I'm going to start with arbitration. And there we've got to take a step back and think about the two different avenues in which you can. You're saying that the action under the Nursing Home Care Act doesn't, that that's not arbitration? So the arbitration agreement applies to the facility and its subsidiaries and its owners. And it's our position that Mr. Hormann is not an owner and, therefore, is not part of what's contemplated in the arbitration agreement. He was the CEO of it. So it's the main thing. Your position is he's not a proper partner? Right. Why is that? Because he's not an owner. So under the Nursing Home Care Act. What does he have 8.7% of? That's their position. But I guess I'll start with Mr. Hormann. The motion was supported by the LLC agreement for the Hartley facility, which specifically states right at the top that HCR4 Healthcare LLC, which is also known as the license loan, is 100% equity in number. And that it also lists out all of the members and the officers and directors associated with that entity. Mr. Hormann is not listed anywhere in the LLC agreement as having ownership or being involved in the operation. So the case against Mr. Hormann was? But why is he listed on the Department of Public Health website under the nursing home section as being an 8.7% owner in the license for Heartland of Galesburg? That I cannot explain since I don't have access to the Department of Public Health. But it is in the record. No, no. In fact, that's the printout that counsel presented in opposition to the LLC agreement. And I can't speak to where the IDPH has their information to put forth that information. And he's got the licensee. I think he's only listed within 8.7% ownership. So all I have is from my client what they have is that the LLC agreement shows that 100% equity in number is HCR 4.0. Well, I'm just wondering. But you've got this conflicting thing. And I don't know whether he's an owner or not. And I suspect he's my colleague. But on motion to dismiss, it seems to me that you've got this conflicting information. Wouldn't a better route, assuming this thing belongs in the circuit court to wouldn't a better route to let parties do discovery on that and then address the issue, perhaps, if you think you've got a motion for summary judgment at some point as opposed to a motion to dismiss? That would be more for Mr. Warner to advocate for. I filed my motion. He showed up and countered with a printout from the Internet. Never asked for time to conduct discovery. He never asked the court to intervene and, you know, set forth all the different discovery that he would need. He indicated that he tried to call the IPH but didn't get a response. I think that was argued before the trial court did a hearing. And what the court had was the legal document that I attached to my motion against a printout, which I pointed out was inherently flawed because the administrator has listed on that printout I knew was inaccurate. And then you add in the fact that I have this LLC agreement, which clearly shows that the 100% equity number is HCR 4. And then you have this, again, a printout from the IPH website, which is unauthenticated and really unsupported. And I think the court weighed the two against each other and went with the LLC agreement to leave it that way. And so this LLC is 100% owner of the facility and the license? The licensee is Hartman & Gettler. Okay. That's based on the filing of the state of Illinois. I know that. The ownership of the facility, you know, the flow of the cash flow, the profit and the losses is 100% HCR 4. And as I explained, you know, there is a complete record of the corporate structure. But as I explained at the hearing for the trial court, Paul Harbaugh was, he's no longer, he retired by the time we were up for a hearing, was the CEO of HCR Manicure Inc. in Ohio, which is the parent company for all of the Hartman and Manicure facilities across the nation. So, again, there's a lot of things that go in between him and various entities that trickle down to Hartman & Gettler. But, again, it's not a shell game. No one's trying to play hide-and-seek here. I thought it was being very forthcoming and just offering the LLC agreement, which clearly proved my position. So getting back to the arbitration, again, there's two avenues here that you can argue. And it starts with this court's decision in person. The factual circumstances here are very common. You know, we have an incapacitated spouse and the other spouse acting for that spouse with pretty much everything that's going on. What Curto did not discuss is this argument about health care decisions. That came later in the theology AC 2015. So if we focus just for a minute on Curto, what I frequently encounter is what the appellant has argued here is that where you don't have that express authority, that power of attorney, that authority should pay for something to that effect, that spouse can never have full authority to make a legal rights decision and property decision. Curto doesn't say that. That's not my reading of Curto. It clearly says that when you're faced with, you know, weighing a spouse's signature, the authority of the spouse to act as a public spouse, general agency rules apply. It can be expressed, it can be implied, or it can be apparent. And again, the argument that I frequently encounter from plaintiffs' attorneys or against enforcement of arbitration is that it's almost like every time the agent makes an action, you have to see something from the principal saying, yes, that's okay, or I agree with what you've done here. That simply cannot happen once you have a patient that has been incapacitated. And the court, I think, was limited in Curto because there was no, as far as I can tell, no discovery that was done. You didn't know one way or the other whether the patient there was incapacitated. And all you were really weighing was what's the effect of the spouse's signature on an arbitration agreement. And it was true then, and it remains true, that a spousal relationship alone doesn't create an agency relationship. This is the case that's implied or apparent for you because what we have now here, what we didn't have in Curto was a record. And that record is based on... I'd like to back up. There was a record in Curto. I don't mean to make no reference. No, and there was. I mean, some of the things you're saying that, no, there was. And actually, the resident was not incapacitated at the time that they became a resident at that facility. Okay. Again, I'm just trying to wind up the ruling. And I did happen to go back and listen to the audio in one of the questions, and it was, was she incapacitated, and what did we do in that circumstance? So it didn't sound like the full record was there, but maybe it was. What we have here is, I think, a more complete record, which includes the deposition testimony of the individual that signed the arbitration agreement. And what he sets up is a prior course of dealing. If you put aside that they were married, they had a 40, 45-year history together where they were engaged in property decisions, finance decisions, health care decisions. What you clearly have from him is that, or the testimony from him is that his wife always involved him in property and finances and health care. And what his belief was is that in the event she became incapacitated, there was no reason for him to not believe that she would not want him to be her surrogate decision-maker. That's the course of, the prior course of dealing that establishes the employer-authority relationship moving forward after she suffers an instruction. That's what we have here. And I think that's what CURTA in general supports, that it's not just the estate claim that should occur when you're young and healthy, but it's, can we have this other course of dealing that establishes that implied parent authority so that when you become incapacitated... Is implied and apparent synonymous? It's not synonymous. I mean, it's just, no, implied is more deals with that prior course of what the agent believes the principal would have wanted. Apparent authority adds in more to what Hartland, the third party, perceived from that relationship, that extra element. So when she gets to the facility, Hartland is faced with a woman who is unable to act for herself, and a husband, and a husband alone, no one else is involved, who's signing paperwork, making decisions. They know that the feeding tube is in place. They know that the breathing tube is in place. They know that someone had to make those decisions for this woman, and they know that it was the husband that did it. With no one else involved, it's reasonable for them to infer that he is acting with some type of authority. And, again, in this case, what we've established through his deposition testimony is that that implied and or that apparent authority is there. As far as the health care decision argument, so that came up through Fiala in 2015. And what Fiala says is that when the arbitration provision is integral to the decision to admit, it will then be considered a health care decision. And what the folks on the other side have sort of construed that to be is that it has to be a condition for admission. And it's hard to believe that the Second District's intent would be that. Well, let's talk about that, because with this separate agreement signed the second day, as you've already admitted, the state's involuntary, what consideration was given in exchange for the signing of this agreement? Well, the consideration, and I'm glad you brought it up, because I was going to admit that, too. The consideration is the mutual agreement to arbitrate. And that has been set forth as good law by the Illinois Supreme Court in the current case. That is sufficient consideration. So I hope that answers your question. But getting back to the health care decision, what I don't think the intent of the Second District was is to tell nursing homes that if you want to make an arbitration provision in a health care decision, you have to incorporate it into the contract so it's really one of a take-it-or-leave-it contract of adhesion situation. I don't think that was the intent, although that's what it's been construed as to mean. The signing of the arbitration agreement was not a condition for admission. But these two agreements were signed on the same day, at the facility, on August 26th. The same day? The same day. Okay, so not a day later. No. Both documents were signed the day after admission. But on the same day. Oh. The gentleman has two minutes. But in any event, the two agreements do reference one another, and it's pretty clear that the arbitration provision is integral to the entire admission agreement. It's mentioned in the pending notice. So you admit before there's an admission agreement signed? It can be. So that's kind of the issue that, you know, with these situations, you can't just step back like a credit card and say, well, why don't we go through all the terms here and make a decision, and we'll have you sit back here, and once we get that signed agreement, we'll let you sign off on the credit card. You have a woman that is incapacitated. She presents from the hospital. There has been some communication before the admission about, between the hospital staff, the nursing home, between the spouse, that here's what we're going to do. We're going to get her into the facility. Formalizing the paperwork does not always happen on day one, and that's simply because you can't just stop everything and hold off on caring for the patient. That's just the nature of it. Does the Health Surrogate Act, or do you have any definition for a health care decision? You know, you call the arbitration agreement a health care decision, but saying it doesn't necessarily make it so. Do you have any support or any definition for that? Right. So the Health Care Surrogacy Act doesn't discuss arbitration agreements. It just discusses the admission process, and not just the admission process, but basically that the surrogate is going to make sure that payments made for the services and things of that nature, everything that goes along with being admitted and going through being at a facility, a hospital, whatever. Does it discuss arbitration specifically? No. That's really more pouring out of the ALA and the integration of the two agreements, and us saying that this is all part of the admission process. It's not just I'm signing my name so my wife can be cared. There's more to the admission itself. We're going to pay for care. Do you want us to hold the money? If not, do you want to handle the money? Are you going to ensure us that if you handle the money, you're not going to misuse the money? That's also important in the admission agreement. It's not just care that the Surrogacy Act and the admission agreement is talking about. It's everything that goes along with a patient being incapacitated and at the health care facility. So, again, we're arguing that it's a health care decision because the two agreements are integrated. They're signed on the same day at the same facility by the same person, and within the admission agreement, there's reference to the... But in this case, they weren't signed on the same day, right? No, they were. Let me just check because that's come up twice. They were? That's what he just said earlier. I asked him to verify that. I thought I'd read in the briefs that he signed the document one day, one, and an arbitration agreement the second day. No, just so it's clear to the record, the signature page for the admission agreement is signed August 26th, and the arbitration agreement is also signed August 26th. So just to close out, in the pending notice of the admission agreement, there is reference to the arbitration agreement, but that being part of the decision that you're making in terms of venue, if you want to go with the voluntary arbitration, that's fine. You just have to sign that agreement. And then the arbitration agreement specifically states in paragraph one that this is relating to any and all disputes arising out of this agreement in the arbitration agreement and the admission agreement, and that language tracks the language that was used in the FIALA case. Really the only difference here between this case and FIALA is that it's not in the same exact document, but they do reference each other, and it's not a condition for admission. And what's the holding in FIALA? So FIALA, the holding was that there was a health care power return in place and that the arbitration agreement was a condition for admission to that particular facility and, therefore, a health care decision that the power of attorney was allowed to make. I think I'm out of time, so I do ask that the Court confirm the ruling. Thank you, sir. Mr. Warner, some rebuttal. FIALA, I'd like to quote from paragraph 40. We note that the general rule limits the scope of a health care power of attorney to matters involving the principal's health, health care, and that the agent is given no authority over the principal's property or financial matters. The State of Scotland, 2013 L.A. 4th, 120271. Courts have held where the arbitration provision is optional or otherwise not necessary to gain admission to a long-term care facility. The agent acting pursuant to the health care power of attorney is not authorized to sign the arbitration provision, and the patient can have the power. Let me ask you about that. Does it make any difference that the patient is deceased? Because we keep talking about compromising or negotiating away her rights. Well, her rights really aren't at issue anymore. It's the estate's rights. This is statutory cause of action, the survival act, right? And so it's somebody else's right to recover for her injuries. She's not recovering for it. Is that of any import at all? No. I suggest that her rights don't extinguish when she passes pursuant to the survival act or any other statute that says that once something was not enforceable before she dies, it now becomes enforceable. Well, I mean, but at common law, one's cause of action died with them, right? Well, at common law, yes. At common law, there was no law for death statutes, but by statute, which is corrected, the survival action allows her case for her personal injuries to survive. So under FIALA, you cite the general proposition that whatever the language was, the property of, okay, the principal, correct? Yes. And yet FIALA said there's a health care power of attorney here. And that health care power of attorney, that agent could bind the principal to this arbitration agreement. Not the health care power of attorney. What was it? I didn't get to the second paragraph there, but FIALA stands with the proposition that standing alone, the arbitration agreement or the admissibility agreement into the nursing home is not conditioned on the arbitration agreement, then there is no ability for the deceased to grow a sign on behalf to create an agency situation. FIALA tells us that if and only if the arbitration agreement is made a condition to enter into the facility, then it becomes an integral part of the... Well, let me, in FIALA, the arbitration agreement was integral to the admission agreement and a requirement, correct? Well, it only became integral because the agreement said, very specifically because the admission agreement said that you don't get admitted unless you sign this. Okay. So anything being, and that was the holding in the case, right? If it was required as a condition proceeding to admission, then the health care person, the power of attorney or a surgeon, can sign that and buy it, right? If it's a health care decision. But anything beyond that, where the court is waxing poetic about it under other situations, is dicta, is it not? That's not the point, because that wasn't... They didn't have a case where it wasn't required as a preconceived, or a condition proceeding to admission. But in that particular case, though, in FIALA, if it's a condition proceeding to admission, it's a health care decision. So as far as FIALA alone, anything beyond that is dicta, is it not? I think I can put a poll on that. It's dicta in terms of that issue. But it also, by its very nature, FIALA tells us that the arbitration agreement standing alone is not a health care decision or agreement, because if it was, you wouldn't reach FIALA. You would have to deal with it. And that's why I get back to that phrase at the end of the agreement, that the arbitration agreement that says, we acknowledge that this is a health care, the above is a health care decision. Well, you don't even have to get to the issue, or do they mean the sentence before that, or do they mean the admission agreement? Because FIALA tells us that it's not. Just because a party says something and their interrogation of the case doesn't make it the law, the appellate courts have decided that. And that's the law at that time and in 2015. So this is really a bootstrap argument. There was no testimony at all that was presented by the nursing home. None at all. And you have to have what they reasonably believe to support their contention. We say there was none. We don't have to prove the negative. We can't. No testimony. The counsel is incorrect. I did ask them for... I said, give me an affidavit by Mr. Warner. We provided an affidavit. We presented Mr. Campbell. That's all I have to say. That's all I have to say. That's all I have to say. Thank you. Thank you both for your arguments here today. This matter will be taken under advisement. A written disposition will be issued, and I believe...